### In re ORTHOPEDIC BONE SCREW PRODUCTS LIABILITY LITIGATION.

**Daniel FANNING et al. and Margaret Schmerling et al.,**

v.

**ACROMED CORPORATION.**

No. MDL 1014.
C.A.No. 97–381.

United States District Court,
E.D. Pennsylvania.

Oct. 17, 1997.

---

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

### I. INTRODUCTION

Presently before the court is the Joint Motion of the Plaintiffs' Legal Committee ("PLC") and AcroMed Corporation ("AcroMed") for Approval of the Proposed Settlement Agreement and for Certification

of a Settlement Class and objections presented by various interested parties. For the reasons discussed below, the court concludes that the requirements of Federal Rule of Civil Procedure 23 have been satisfied and that under the circumstances particular to this litigation the settlement is fair, reasonable and adequate. Therefore, the court will grant the motion and approve the settlement pursuant to Fed.R.Civ.P. 23(e).

## A. General Background

AcroMed is a manufacturer of orthopedic bone screws that in recent years have been used by surgeons in spinal fusion surgery.[1] (Rountree Decl. ¶¶ 3–5).[2] In December 1993, the ABC News program *20/20* featured a story on the screws and their use in the pedicle of the spine. (Werder Decl. ¶ 4).[3] After that broadcast, thousands of people who had undergone spinal fusion surgery involving pedicle screws filed suit against AcroMed and other pedicle screw manufacturers. In August 1994, the Judicial Panel on Multidistrict Litigation transferred all cases pending in federal trial courts against manufacturers of pedicle screws to this court for pretrial purposes pursuant to 28 U.S.C. § 1407.[4]

The coordinated federal litigation has been directed for plaintiffs by the PLC, a nine-member committee appointed by this court in December 1994. *See Pretrial Order Nos. 2,* 1994 WL 923395 (E.D.Pa. Dec. 14, 1994).

During the first two and one-half years that this MDL proceeding was pending, the PLC conducted substantial discovery from AcroMed and the other defendants.[5] *See Pretrial Order 1063.* Before agreeing to the settlement, AcroMed played a leading role among the defendants. Although the relationship between AcroMed and the PLC has been professional, it has certainly been adversarial. Following extensive discovery, the court suggested the parties explore the prospects of settlement.

## B. The Settlement Agreement

### 1. Negotiations Between AcroMed and the PLC

The negotiations between AcroMed and the PLC were conducted at arms' length by capable counsel. These negotiations were "long" and "protracted." (Tr. 7/8/97 at 126). In negotiating the settlement, the PLC consulted other plaintiffs' counsel for their views on various provisions of the settlement agreement. After reviewing the settlement agreement and its supporting materials, the court entered *Pretrial Order No. 724,* which, among other things, granted temporary class certification, authorized the giving of class notice and scheduled a fairness hearing.

### 2. Primary Provisions of the Settlement Agreement [6]

In accordance with the agreement, AcroMed will contribute $100 million to a

---

1. The bone screws are inserted through the "pedicles" or bony archways of the spine to attach an implant to the spine in order to promote fusion of the spine. AcroMed's bone screws, when used in this manner, are most commonly called "pedicle screws."

2. Citations to "Rountree Decl." refer to the Declaration of W. Dekle Rountree, Jr., president and chief executive officer of AcroMed.

3. Citations to "Werder Decl." refer to the Declaration of Richard I. Werder, Jr., lead outside counsel for AcroMed.

4. Originally most of the cases filed against AcroMed were brought on behalf of patients treated with AcroMed devices. As the litigation progressed, however, AcroMed was also named as a defendant in many non-AcroMed device cases under civil conspiracy and concert of action theories of liability. These later cases have been referred to as "omni" actions because the

complaints included scores of plaintiffs suing scores of defendants, including non-manufacturers. The non-manufacturer "omni" defendants include various professional medical societies, hospitals, and spine surgeons, who are alleged to have wrongfully promoted pedicle screws.

5. For example, the PLC reviewed more than 105,000 pages of documents produced by AcroMed and almost 1.5 million pages of documents produced by other defendants and third parties. The PLC also took the depositions of many AcroMed employees, members of AcroMed's Medical Advisory Panel, current and former distributors of AcroMed's devices, and hundreds of others.

6. Although the agreement is a complicated document, it, not unexpectedly contains many provisions that are not controversial. Therefore, the court will not address every provision contained in the settlement agreement.

"settlement fund."[7] Additionally, AcroMed will assign the proceeds of virtually all of its insurance policies to the settlement fund. (Tr. 4/23/97 at 45–46).[8] When the settlement becomes final, the representative plaintiffs and other class members will dismiss, with prejudice, all "Settled Claims" against AcroMed relating to the use of orthopedic bone screws. *See Settlement Agreement Section I.* In addition to releasing AcroMed from liability, the settlement provides for the dismissal of all claims against treating physicians and hospitals that are based in whole or in part on any products liability-related theory of recovery. (Rountree Decl. ¶ 38).[9] However, claims for independent medical malpractice against these physicians and hospitals will not be dismissed under the settlement. *Id.* These claims are separate and distinct from product liability claims and will go forward and are not affected by the settlement. Members of AcroMed's Medical Advisory Panel technically fall within the definition of "AcroMed" in the agreement. Nevertheless, the agreement places Medical Advisory Panel members in no different position than any other physician with respect to claims for independent malpractice advanced against them by patients whom they actually treated.

### 3. Contribution and Indemnity for Non–Settling Defendants

The agreement contains a release and dismissal of contribution and indemnity claims by non-settling defendants. The agreement also proposes a bar order. The parties request the court to enter an order:

> enjoining the commencement and prosecution of any claim or action by any Non-settling Defendant or other third party against AcroMed or any Released Party, including but not limited to any Claim for Contribution, Indemnity . . . for reimbursement for payments made or to be made to or on behalf of any Settlement Class Member for Orthopedic Bone Screw Related claims, actions, or injuries or for expenses incurred in defending against any such claims or actions.

*See Settlement Agreement XI. A.*

After the court preliminarily approved the settlement, AcroMed and the PLC amended the settlement agreement to address early non-settling defendants' objections concerning contribution.[10] The court approved this amendment.[11] Following the evidentiary

---

7. AcroMed made an initial cash payment of $10 million into an interest-bearing account on the day after the court preliminarily approved the settlement. The balance of the settlement monies will be paid in two installments if the settlement is approved: first, $20 million will be paid on the first business day after the court's final order and judgment approving the Settlement and certifying the class becomes final; second, $70 million (plus interest accruing on that sum from the date on which the final order and judgment is entered), will be paid within one year from the date of the final order, when the judgment becomes "final." The court construes "final" to mean the date upon which all appeals to appellate courts, including the United States Supreme Court, are final.

8. The parties had difficulty approximating the amount of insurance coverage available to AcroMed. However, resolving the actual amount of coverage to be assigned is not essential to assessing the fairness, reasonableness and adequacy of this settlement given the circumstances of this litigation.

9. The agreement also releases claims against certain professional societies such as the American Academy of Orthopedic Surgeons, American As-

sociation of Neurological Surgeons, Scoliosis Research Society and North American Spine Society. The agreement mistakenly referred to the "American Academy of Neurological Surgeons." The proper name of the organization is the "American Association of Neurological Surgeons." The agreement and all related documents are hereby deemed amended to reflect the proper name of the organization.

10. On March 11, 1997, this court entered Pretrial Order No. 800, approving an amendment to the agreement. On July 2, 1997, AcroMed and the PLC filed with the court a second amendment to the agreement. The court has accepted this second amendment and evaluated the agreement as twice amended. Because the amendments to the agreement were clarifying and limiting in nature, the amendments did not require additional class notice.

11. As amended, section XI.B.1 of the Settlement agreement provides:

> No Settlement Class Member shall recover, directly or indirectly, any sums from AcroMed or any Released Party other than those received under the Compensation Program. In the event that any Settlement Class Member recovers a judgment against any Non–Settling

portion of the fairness hearing, AcroMed and the PLC amended the settlement agreement a second time. The second amendment creates a procedure under which non-settling defendants can seek relief from the bar order under certain circumstances. *See infra* Part II.G.4. The second amendment further clarifies the set-off and judgment reduction rights of the non-settling defendants. The judgment reduction and contribution provisions were the subject of much discussion during the argument portion of the fairness hearing.

### 4. *AcroMed Settlement Contingency Fund* [12]

From the money to be deposited under the settlement agreement there is to be created a "contingency fund," in addition to the settlement fund. This contingency fund is designed to provide some protection to AcroMed against class members who are AcroMed Orthopedic Bone Screw Recipients who, despite the agreement, pursue lawsuits in federal or state court or submit claims under the agreement and who do not execute a release and indemnity agreement. *Settlement Agreement IV.D.3.c.* The agreement provides that AcroMed shall have the right to request that the court order a payment from the AcroMed settlement fund to the contingency fund

> to cover all reasonable costs and services incurred in defending, settling, or satisfying judgments entered in any claims or proceedings involving Settled Claims of Settlement Class Members (and all cross-claims and third-party claims, including Claims for Contribution, Indemnity, and/or Subrogation, involving Settled Claims of Settled Class Members) that are not terminated as a result of this agreement or that are filed in the future despite this agreement.

*Settlement Agreement Section IV.D.3.b. and d.* The court notes that the primary and overriding purpose of the settlement agreement is the establishment of the settlement fund which will assure that class members receive the maximum recovery possible given the circumstances of this case. Any monies removed from the settlement fund for any other purpose would undermine that goal. It should be emphasized that AcroMed's right is limited here to the right to "request" a court ordered payment. Therefore, the court concludes that the term "reasonable," governing which costs may be covered in this setting, will be given a strict and narrow construction upon any requests made for indemnification or payment from the settlement fund.

### C. *The Fairness Hearing*

On April 23 and 24; June 3; and July 8, 1997, the court conducted a fairness hearing to determine whether the proposed class should be certified and whether the settlement was fair, adequate and reasonable. All interested parties were afforded an opportunity to be heard, to submit evidence and to cross-examine adverse witnesses. Sofamor Danek, a non-settling defendant, was granted standing to intervene in the Class Action pursuant to Federal Rule of Civil Procedure 24(a)(2) for the limited purpose of protecting any contribution claims it may have against AcroMed. *See Pretrial Order No. 837,* 1997 WL 164237 (E.D.Pa. Mar. 26, 1997). The evidentiary portion of the hearings focused in great measure on AcroMed's financial condition and the effect of bone screw defense costs on AcroMed's ability to sustain itself as a going concern.

### D. *AcroMed's Defense Costs and Financial Condition*

Approximately 3,200 plaintiffs who have been implanted with AcroMed devices are now pursuing claims against AcroMed in fed-

---

Defendant, including a Professional Society, for which AcroMed and/or any Released Party would be liable by a claim for contribution and/or indemnity but for the provisions of the AcroMed Settlement agreement, each such Settlement Class Member shall reduce his judgment against the Non–Settling Defendant(s) in accordance with applicable law or, in the absence of a statute, by the amount, percentage or share of such judgment lawfully attributable to AcroMed and/or the Released Party or Parties.

12. The agreement also contains a provision for the establishment of a separate contingency fund for payment of claims asserted against AcroMed by non-AcroMed Orthopedic Bone Screw Recipients. This fund has a cap of $2 million.

eral or state courts. (Tr. 4/24/97 at 177; Werder Decl. 15.). These patients' spouses are also plaintiffs in many of these actions. *Id.* Additionally, more than 1500 plaintiffs implanted with other manufacturers' devices, and hundreds of their spouses, have also named AcroMed as a non-implanting defendant in federal or state courts based on conspiracy and concert of action theories. *Id.*

It is likely that most of the cases pending against AcroMed would have been set for trial dates beginning in 1997 and following. (Werder Decl. ¶ 19). If the parties had not agreed to the settlement, it is likely that AcroMed would have been required to defend at trial, at a minimum, between 40 and 50 orthopedic bone screw cases in 1997. (Werder Decl. ¶ 22.). It is also likely that AcroMed would have faced between 250 and 500 bone screw trial dates in 1998. (Werder Decl. ¶ 22.).[13]

AcroMed estimates that it would have incurred defense costs of $25 million or more in 1997 if an agreement had not been reached. (Werder Decl. ¶ 24). Defense costs for the two bone screw cases that AcroMed tried in 1995 and 1996 averaged $250,000 per case. (Tr. 4/23/97 at 124). Intervenor Sofamor Danek provided the court with data concerning its defense expenditures, which totaled approximately $23 million in 1996. (Tr. 6/3/97 at 80). Additionally, in 1996 Sofamor Danek set aside a reserve of $50 million for future litigation. *Id.* at 81. These figures support the assessment of AcroMed's likely defense costs. Sofamor Danek and AcroMed have similar bone screw products that are the subject of this litigation and the "litigation experience of Sofamor Danek has been somewhat similar to the recent litigation experience of AcroMed." (Ex. D–1 at 7). Therefore, an estimate of Sofamor Danek's defense costs is relevant, albeit not determinative, to the court's evaluation of the reasonableness of AcroMed's projected defense costs.

As of June 30, 1997, AcroMed's net asset value stood at about $58 million. (Tr. 4/23/97 at 120; Ex. B–1 at 2). AcroMed does not have a significant amount of assets, such as real estate or equipment, upon which potential lenders often base lending decisions. (Ex. B–1 at 3). However, one of AcroMed's most important assets is its "network between the company and its physician and surgeon base." (Ex. P–6 at 2). This network allows AcroMed to generate "cash flow," or borrowing power, that lenders will use as a basis for lending decisions. *Id.* A cash flow analysis allows a lender to make an assessment of a company's ability to repay liability obligations. *Id.* The PLC's financial expert, Dr. Rosen, estimated the going concern value of AcroMed, based on an analysis of the company's cash flow, at about $104 million.[14] (Tr. 4/23/97 at 120–21). This amount reflects "what a willing buyer would pay a willing seller for this company (the cash flows generated) without the financial constraints of the litigation costs and the uncertainty of litigation outcomes." (Ex. P–6 at 6). Dr. Rosen concluded that it is unlikely that AcroMed's expected cash flow would be sufficient to satisfy the claims against AcroMed. (Tr. 4/23/97 at 130).

AcroMed's financial expert, Mr. Romney, approached the issue from a different perspective, but reached a result that is consistent with Dr. Rosen's. (Tr. 4/24/97 at 235–40). Mr. Romney concluded that the anticipated defense costs over the next two years exceeds AcroMed's financial resources. *Id.* at 243. He also concluded that, in light of the expected level of defense costs, continued litigation would leave AcroMed with little, if any, cash to compensate plaintiffs. *Id.* at 245. Additionally, "AcroMed cannot fund its obligation under the settlement agreement from cash on hand." (Romney Decl. ¶ 18).[15]

---

**13.** These estimates do not include "omni" actions involving other manufacturers' devices in which AcroMed was named as a defendant on a conspiracy or concert of action theory. (Werder Decl. ¶ 22).

**14.** Dr. Rosen based his opinions on independently prepared financial statements and tax returns audited by the IRS.

**15.** Citations to "Romney Decl." refer to the Declaration of John P. Romney, a partner in the Corporate Finance Group of Accounting and Professional Services firm Ernst & Young.

However, AcroMed's cash flow is sufficient for a lending institution to provide a loan that would make money available for settlement. (Romney Decl. ¶¶ 21–25). The settlement provides for the establishment of a $100 million dollar fund. This fund is actually greater than AcroMed's $58 million dollar asset base. Therefore, the settlement provides AcroMed with more resources from outside sources to resolve its pending claims than would otherwise be available.

The PLC's financial expert testified that "even if only 10% of the [total] filed claims involving AcroMed devices were tried, that would amount to 320 trials." (Ex. P–17 at 7). Therefore, "[a]t $200,000.00 to $250,000.00 per trial, the company would incur defense costs of between $60 and $80 million .... without regard to the outcome of the trial." *Id.* Obviously, if a larger number made it to trial, the risk of asset depletion would increase substantially.

Beginning in December of 1993, AcroMed itself has largely funded its bone screw defense. (Rountree Decl. ¶ 57). AcroMed's available insurance coverage is limited and disputed. *Id.* Coverage may be available for some claims, but the insurance policies' limits are lower than the probable cost of resolving pending claims. *Id.* AcroMed's products liability insurance policies total $5 million dollars. (Tr. 4/24/97 at 201). At present, AcroMed is involved in litigation with one of its insurers. However, even a victory in that coverage litigation would likely generate proceeds that would cover only a small amount of AcroMed's defense costs. (Rountree Decl. ¶ 57); (Tr. 4/23/97 at 46). In an earlier proceeding the PLC represented to the court that an AcroMed interrogatory answer disclosed that AcroMed's total liability insurance coverage is approximately $29.5 million. *Pretrial Order No. 8*, 1995 WL 273597 (E.D.Pa. Feb. 22, 1995).[16]

Currently, AcroMed is a financially healthy company. (Tr. 4/24/97 at 149). However, the present bone screw litigation threatens its survival. AcroMed's outside financial auditors, Deloitte & Touche, LLP, stated that

"if judgments were to be awarded against [AcroMed] in the amounts claimed by the various plaintiffs, the obligation to pay such judgments could have a material adverse effect on [AcroMed]'s ability to continue as a going concern." (Brown Objectors Ex. B–1 at 9). In addition, the threat of liability presented by this litigation has substantially limited AcroMed's ability to borrow funds or obtain equity financing. (Rountree Decl. ¶¶ 50, 58–59; Romney Decl. ¶ 15). Despite the current health of AcroMed's business, internally generated cash from operations would be insufficient to finance AcroMed's forecasted defense expenditures. (Rountree Decl. ¶ 60).

Both the PLC and AcroMed's financial experts testified that the defense costs anticipated for 1997 and 1998 likely would have prevented AcroMed from surviving as a going concern, even if it prevailed in every case that went to trial and paid nothing to settle any case. (Tr. 4/23/97 at 125). One objector has suggested that AcroMed could have reduced its defense costs by agreeing to litigate on a class-wide basis. This argument overlooks a critical fact. "Agreeing" to litigate on a class-wide basis is not an available litigation option. Class certification is reserved to the court and the court alone. Classes are certified pursuant to the Federal Rules of Civil Procedure as a matter of law, not through an agreement of the parties. In any event, class certification was denied by the court in February of 1995. *See Pretrial Order No. 8*, 1995 WL 273597 (E.D.Pa. Feb. 22, 1995). This objection, therefore, has no bearing on whether a class should be certified at this time under Rule 23(b)(1)(B).

An overlay to projected defense expenditures is the block of civil actions of individual plaintiffs. Those plaintiffs are seeking hundreds of thousands of dollars of compensatory and punitive damages from AcroMed in individual lawsuits. Before the settlement agreement, AcroMed (or its insurer) settled 44 bone screw cases. (Werder Decl. ¶ 34). The average settlement in those cases was approximately $131,000.00. *Id.* AcroMed

16. Regardless of the final outcome of the insurance litigation, AcroMed will assign virtually all

of its insurance policies to the settlement fund.

has tried four cases, resulting in two judgments for AcroMed and two judgments for plaintiffs. The average award was approximately $561,500.00, including interest and costs. *Id.* The total average paid out in trials and settlements to date is approximately $143,000.00. *Id.* In addition, AcroMed has disposed of approximately two hundred and fifty cases without any payment to plaintiffs. (Tr. 4/23/97 at 25). Including these dismissed cases, the average payment for the disposition of a case (excluding defense costs) is approximately $23,000.00 per case. *Id.* at 176–181. That average value suggests total awards and settlements of about $69 million in the pending cases. *Id.*

As noted, two hundred and fifty cases against AcroMed have been disposed of without payment. Those dispositions largely involved plaintiffs whose cases were dismissed for procedural reasons related to their commitment to the litigation. The remaining plaintiffs and their counsel however, are highly motivated. A number of plaintiffs may continue to drop out because of the burdens of litigating. However, it is likely that the majority will remain. In all of these cases that were, or in the future may be dismissed or abandoned without payment to a plaintiff, defense costs to the point of closure have been and are an unavoidable burden.

Another way to view this circumstance is as follows. If the court considers only cases involving AcroMed devices pending as of December 1996, and if it won nine out of every ten cases that went to trial, but lost one verdict equivalent to that awarded in earlier tried cases, AcroMed faces potential awards in excess of $100 million (Tr. 4/24/97 at 105). While these earlier tried cases may not be completely representative of all potential awards against AcroMed, they do illustrate a range of exposure that cannot be ignored and a potential for some large verdicts. These potential verdicts must be carefully and fully assessed and defended against. Meanwhile, plaintiffs' counsel have demonstrated their intention to execute their professional duty owed to their clients in a manner that would position them to recover the maximum award to which their clients were entitled. There-

fore, faced with this potential liability, AcroMed's projections are a reasonable approximation of its expected defense costs if this litigation were to go forward without a settlement.

Additionally, AcroMed would be unable to borrow money to continue defending this litigation without a settlement agreement in place. (Tr. 4/24/97 at 173). Prior to the agreement, AcroMed was not permitted by its lender to use its existing line of credit to defend, settle, "or in any way to support litigation." (Tr. 4/24/97 at 173). The proposed settlement was crucial to AcroMed's ability to obtain an amendment to its line of credit. This amendment now allows the line of credit to be used to fund this settlement. AcroMed's lender would not agree to allow the line of credit to be used for defense costs in a situation that would not bring closure to the litigation. (Rountree Decl. ¶ 50). Nor would other lenders provide a credit line that would permit AcroMed to use loan proceeds for defense purposes. (Tr. 4/34/97 at 222).

The evidence presented shows that the $100 million that AcroMed will pay to settle this litigation is at the outer boundary of what AcroMed can afford to pay. (Romney Decl. ¶ 21). The fact that Dr. Rosen and Mr. Romney have both reached this conclusion using different methodologies supports this finding. The court finds their testimony to be credible and persuasive. All of this evidence relating to AcroMed's financial condition is essential to the court's analysis regarding certification of a class under Federal Rule of Civil Procedure 23(b)(1)(B).

### E. *The Settlement Class*

As defined in *Pretrial Order No. 724,* the class includes:

All persons and entities wherever located, who have or may in the future have any claim (whether filed or unfiled, existing or contingent, and specifically including claims for alleged injuries and damages not yet known or manifest), including assigned claims (*e.g.,* subrogation claims by workers' compensation insurers, employers, and/or health care insurers or providers), in any state or federal courts of the United States or the courts of its territo-

ries or possessions, against any or all of AcroMed and the Released Parties arising out of, based upon, related to, or involving Orthopedic Bone Screws that were implanted in the United States or its territories or possessions in an operation that occurred on or before December 31, 1996, including all persons who have been implanted with one or more Orthopedic Bone Screws on or before December 31, 1996 (whether or not any such Orthopedic Bone Screw has been or may be removed) and all persons, including spouses, parents, children, relatives, "significant others" where warranted by law, representatives, and estates, that, because of a personal relationship with any Orthopedic Bone Screw Recipient in whom an Orthopedic Bone Screw was implanted on or before December 31, 1996, have or may have Orthopedic Bone Screw Related claims.

The settlement agreement does not affect claims based on bone screw implants occurring after December 31, 1996. Additionally, it does not include non-settling defendants, who might assert contribution or indemnity claims against AcroMed. While the settling parties contend that the original agreement protected non-settling defendants in this regard, in the face of objections they amended the agreement to make it especially clear that non-settling defendants were not members of the proposed class or adversely affected by that prospect. Thus, in *Pretrial Order No. 800*, the definition of the class was clarified:

The Settlement Class as defined in Section I of the AcroMed Settlement agreement and Paragraph 3 of Pretrial Order No. 724 does not include (a) AcroMed, the Released Parties, the Professional Societies, or any person claiming by or through such persons and entities or (b) any Non–Settling Defendant, including without limitation, all device manufacturers or health care providers named as defendants in MDL Docket No. 1014, or any person

claiming by or through such persons or entities, except to the extent that the Non–Settling Defendant is an insurance carrier that, in some other capacity, may assert assigned claims or subrogation rights, in which case the insurance company is a Settlement Class member only for purposes of asserting assigned claims or subrogation rights.

The class was given notice of the proposed settlement agreement. Once notice of the proposed settlement agreement was disseminated, the next step in the process was the Fairness Hearing at which all interested parties were given an opportunity to be heard. Based on the evidence and arguments presented, the court must decide three primary issues: 1) whether the elements of class certification under Federal Rule of Civil Procedure 23(a) are met; 2) whether there is a "limited fund" under Rule 23(b)(1)(B); and 3) whether the settlement is fair, reasonable and adequate under Rule 23(e).

## II. *DISCUSSION*

### A. *Jurisdiction*

■ This court has subject matter jurisdiction over these proceedings pursuant to 28 U.S.C. § 1332. Diversity of citizenship is present between the named class representatives and the defendant. Additionally, the amount in controversy exceeds $50,000.[17] The class members allege permanent physical harm, pain, mental anguish, emotional distress and other injuries. Many class member claims also include disablement, substantial medical expenses and loss of income. Additionally, claims for punitive damages are included when computing the amount in controversy. *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505, 522 (E.D.Tex.1995) (citing *Bell v. Preferred Life Assurance Soc.*, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943)). The plaintiffs in this case are, in fact, seeking punitive damages. Therefore, the amount in controversy requirement is met because each class

---

**17.** Although the 1996 Amendment to 28 U.S.C. § 1332 raised the amount in controversy requirement for diversity from $50,000 to $75,000, that amendment did not take effect until 90 days after its date of enactment on October, 19 1996. *See* Pub.L. No. 104–317, § 205(b) (1996). As this

action was commenced on January 16, 1997, the amount in controversy need only meet the $50,-000 requirement. *Grandon v. Merrill Lynch & Co., Inc.*, 1997 WL 411924, at *9 n. 8 (S.D.N.Y. July 22, 1997).

member could lawfully allege damages in excess of $50,000.

■ The court also finds that the "case or controversy" requirement is met. Article III of the United States Constitution requires that federal courts only entertain actual "cases or controversies." U.S. Const. art. III, § 2. This requirement has been interpreted as meaning that the court must be presented with an "honest and actual antagonistic assertion of rights." *United States v. Johnson,* 319 U.S. 302, 305, 63 S.Ct. 1075, 1076, 87 L.Ed. 1413 (1943) (quoting *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U.S. 339, 12 S.Ct. 400, 36 L.Ed. 176 (1892)). The settlement before the court "address[es] the immediate and important controversy of whether future claimants will be able to receive compensation for their injuries before [Acromed] runs out of money." *In re Asbestos Litigation,* 90 F.3d 963 (5th Cir.1996), (hereinafter *"Ahearn "*), *vacated for further consideration, Flanagan v. Ahearn,* —— U.S. ——, 117 S.Ct. 2503, 138 L.Ed.2d 1008 (1997). It is noted that the Fanning complaint requesting class certification was filed for settlement purposes only. However, it is well established that a class may be certified for settlement purposes only. *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 630 (3d Cir.1996), *aff'd. sub nom., Amchem Prods., Inc. v. Windsor,* —— U.S. ——, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.,* (hereinafter *"GM Trucks "*) 55 F.3d 768 (3d Cir.1995).

This litigation has been before this transferee court for three years. During that time this has been nothing less than an uninterrupted, hard-fought, "antagonistic" legal battle. All parties involved have vigorously asserted and defended a variety of pleading and discovery matters and litigated a plethora of motions generated by those engagements before this court. As a result, this court has issued over 1,100 pretrial orders in this litigation. The court record in this proceeding accurately tracks and, on a virtually daily basis, punctuates the extent and vigor of these pretrial confrontations and skirmishes. There can be no other reasonable conclusion than that these parties, at all times during this litigation, have been positioning themselves for trial and post trial proceedings. Clearly an "honest and actual antagonistic assertion of rights" exists in this case. The Article III "case or controversy" requirement is plainly met.

## B. *Class Certification*

■ Federal Rule of Civil Procedure 23 allows class action certification for settlement purposes, as well as litigation. However, "actions certified as settlement classes must meet the same requirements under Rule 23 as litigation classes." *GM Trucks,* 55 F.3d at 799. The proposed class must satisfy the requirements of 23(a) and 23(b).

■ Under 23(a) the court must find that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. The Supreme Court has stated that settlement is a relevant factor in determining class certification under Rule 23. *Amchem Prods., Inc. v. Windsor,* —— U.S. ——, ——, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). This court understands that statement to mean that while a proposed settlement may be considered as a factor, it may not be a substitute for any of Rule 23's requirements. *See GM Trucks,* 55 F.3d at 799–80. Therefore, in deciding whether or not Rule 23(a)'s requirements are met here, this court will consider the terms and effect of the settlement agreement as a relevant factor.

■ If the requirements of Rule 23(a) are satisfied, the parties then must establish that the suit fits within one of the three categories of Rule 23(b). *Weiss v. York Hosp.,* 745 F.2d 786, 807 (3d Cir.1984). The parties here seek certification under Rule 23(b)(1)(B) for a "limited fund" class. For the reasons discussed below the court finds that Rule 23(a)'s requirements are met and the suit fits within the requirements of Rule 23(b)(1)(B).

## C. *Rule 23(a)'s Requirements*

### 1. *Numerosity*

Rule 23(a)(1) permits class action treatment only if "the class is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There are no specific standards regarding class size and it is not necessary for a plaintiff to allege the exact number of class members to satisfy the numerosity requirement. *Ardrey v. Federal Kemper Ins. Co.*, 142 F.R.D. 105, 109 (1992). The 3,200 claims against AcroMed include filings in approximately eighty-five federal districts in forty-six states. However, the class is larger than just those parties that have filed claims. The class includes all individuals that have or may have any claim against AcroMed and the Released Parties arising out of or related to Orthopedic Bone Screws that were implanted in the United States in an operation that occurred on or before December 31, 1996. Based on a review of Acromed's sales records, the estimated total number of pedicle fixation surgeries performed in the United States with AcroMed devices before December 31, 1996 exceeds 100,000. (Rountree Decl. 16). Joinder of that many individuals in various geographic areas clearly would be impracticable. Therefore, the court finds that Rule 23(a)(1)'s numerosity requirement is satisfied.

### 2. *Commonality*

The next prerequisite for a class action is that there be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This rule does not require that every question of law or fact be common to every member of the class. *Lake v. First Nationwide Bank*, 156 F.R.D. 615, 624 (E.D.Pa. 1994); *Hummel v. Brennan*, 83 F.R.D. 141 (E.D.Pa.1979). "Indeed, a single common question is sufficient to satisfy Rule 23(a)(2)." *Lake*, 156 F.R.D. at 624 (quoting *In re Asbestos Litigation*, 104 F.R.D. 422, 429 (E.D.Pa. 1984)).

Additionally, it is important to note that Rule 23(b)(1)(B) does not have the predominance requirement contained in Rule 23(b)(3). Under 23(b)(3), the court must find "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). The Supreme Court, discussing the *Georgine* settlement class in *Windsor*, made it clear that the "stringent" predominance threshold is much higher and "far more demanding" than that of commonality. *Windsor*, — U.S. at —, —, 117 S.Ct. at 2243, 2250. The Third Circuit also focused on the predominance requirement in its review of the *Georgine* settlement class. 83 F.3d. at 626–30. There are two primary differences between the Settlement Class before the court and the one in *Georgine*.

First, this Settlement Class is not "sprawling" like the *Georgine* class. The class here is much more defined and congruous. Second, there is no "futures" problem like the one present in *Georgine*. The class here consists of all Orthopedic Bone Screw Recipients in whom an Orthopedic Bone Screw was implanted on or before December 31, 1996 who have or may have claims against AcroMed. Spinal fusion surgery involving orthopedic bone screw implants is a "substantial medical procedure". (Ex. AM–1 at 2). Individuals who have undergone this type of procedure know that the surgery has occurred. *Id.* "Exposure to spinal fusion surgery ... is therefore unlike exposure to hazardous substances, where persons may not learn of their exposure until years after it occurred." *Id.* The court also received medical evidence that "the consequences of a failed spinal fusion surgery—i.e., no reduction in pre-operative pain and no improvements in pre-operative function or mobility— virtually always become apparent within four months or less after surgery." *Id.* at 3. The medical evidence shows that most patients will know whether their operation succeeded within four to six months. *Id.* at 3–4. Additionally, two or three months of additional follow-up will be needed before a small additional percentage of patients will know whether their operation succeeded and virtually all will know whether their operation succeeded within one year. *Id.* at 4. Under the terms of the settlement agreement, patients have a minimum of one year after their date of surgery to file claims. Therefore, the problems that concerned the Supreme Court

and the Third Circuit in the *Georgine* class are not present here.

■ Although the Third Circuit held in *Georgine* that common issues did not "predominate," the court did not hold that the *Georgine* class would have failed the "commonality" test. 83 F.3d at 627. In its discussion of this issue, the Third Circuit commented on commonality in the 23(b)(1)(B) context. The court stated:

> We proceed cautiously here because establishing a high threshold for commonality might have repercussions for class actions *very different from this case,* such as a Rule 23(b)(1)(B) limited fund class action, in which the action presented claimants with their only chance at recovery.

83 F.3d at 627 (emphasis added). This statement is instructive and aids in the illustration of the difference between class certification under Rule 23(b)(3) and 23(b)(1)(B). The primary difference is that the commonality element of 23(a)(2) has a lower threshold than the predominance requirement of 23(b)(3). The Supreme Court stated in *Windsor* that the "commonality requirement is subsumed under, or superseded by, the more stringent predominance requirement." *Windsor,* ⸺ U.S. at ⸺, 117 S.Ct. at 2231. Under 23(a)(2) a common question need only *exist,* not predominate, for the requirement to be satisfied. *See generally,* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1763 (1986 & Supp.1997). Therefore, because certification is sought under 23(b)(1)(B) and not under 23(b)(3), the focus in this case is on the commonality threshold and whether a common question of fact or law exists that is shared by all plaintiffs. *Georgine,* F.3d 610 at 627.

■ A common question is "one which arises from a 'common nucleus of operative facts' regardless of whether 'the underlying facts fluctuate over the class period and vary as to individual claimants.'" *Kromnick v.*

*State Farm Ins. Co.,* 112 F.R.D. 124, 128 (E.D.Pa.1986) (quoting *In re Asbestos Litigation,* 104 F.R.D. at 429 (E.D.Pa.1984)). In the instant case, "[common questions of law and fact exist on the issue of whether AcroMed's orthopedic bone screws] are defective products which are unreasonably dangerous." *Pretrial Order No. 8,* 1995 WL 273597, at *6 (E.D.Pa. Feb. 22, 1995). This is a central issue that is common to all class members.[18] In other mass tort actions, the commonality requirement has been satisfied by the existence of a single central issue. *Georgine,* 83 F.3d at 628. Here, as in those cases, common evidentiary showings would have to be made to establish the plaintiffs' product liability claims against AcroMed. This evidence would arise from a common nucleus of operative facts. Therefore, whether AcroMed's bone screws are defective products, under any product liability theory alleged, is a common question.

However, this is not the only common question in this case. The fairness of the settlement is also a common question. The Supreme Court's statement that "settlement is relevant to certification" permits the fairness of the settlement to be considered as a common question. *Windsor,* ⸺ U.S. at ⸺ ⸺ ⸺, 117 S.Ct. at 2247–48. This is particularly appropriate in a 23(b)(1)(b) limited fund situation where equity guides the court's decision. All class members share a common interest in the factual and legal questions that must be answered to determine whether the settlement is fair, reasonable and adequate. The fairness inquiry also arises from a common nucleus of operative facts and is therefore a common question. The existence of these common questions satisfy the commonality requirement of 23(a)(2).

### 3. *Typicality* [19]

■ The third prerequisite to Rule 23(a) class certification requires that "the claims or defenses of the representative par-

---

18. The subrogation and consortium claims are also linked to this same issue. These plaintiffs must also prove that AcroMed is liable under the product liability theory for the consortium and subrogation claims to succeed.

19. The court notes the overlap between the typicality and adequacy of representation requirements. However, because the requirements of Rule 23 must be individually satisfied, the court will discuss each requirement separately.

ties are typical of the claims or defenses of the class." Rule 23(a)(3). Claims qualify as typical where "litigation of the named plaintiffs' personal claims can reasonably be expected to advance the interests of absent class members." *Arch v. The American Tobacco Co., Inc.*, 175 F.R.D. 469, 478 (E.D.Pa. 1997). Additionally, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members." *Id.* (quoting *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 (3d Cir.1987)). "In the settlement context, [Rule 23(a)(3) ] requires proof that the interests of the class representatives and the class are commonly held for purposes of receiving similar or overlapping benefits from a settlement." *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505 (E.D.Tex.1995).

■ In the proposed settlement class presently before the court, all claims arise from the surgical implanting of orthopedic bone screws. Representative plaintiff Daniel Fanning ("Fanning") underwent two spinal fusion operations involving the use of AcroMed's bone screws for pedicle fixation. Representative plaintiff Margaret Schmerling ("Schmerling") underwent spinal fusion surgery and was implanted with orthopedic bone screws supplied by a device manufacturer other than AcroMed, however she has also sued AcroMed. In the complaint, the representative plaintiffs are pursuing causes of action based on fraud on the FDA, civil conspiracy, concert of action, fraudulent marketing and promotion, negligent misrepresentation, strict liability, liability *per se,* negligence, and breach of the implied warranty of merchantability. The principal theory of the representative plaintiffs is that AcroMed marketed an unreasonably dangerous product making them liable to plaintiffs for damages caused by bone screw implants in the pedicles of their spines. This legal theory is typical of the entire class. The conspiracy and concert of action claims are also typical of the absent class members' claims. As pled, the object of the conspiracy appears to have been an agreement to market an unreasonably dangerous product. These claims

derive from the products liability claim and are therefore typical of the class.

■ The plaintiffs also have a uniform interest in obtaining the maximum possible recovery from AcroMed on their products liability-related claims. The existence of individual issues such as the extent of each class members' damages do not preclude the typicality requirement from being satisfied. *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 162 F.R.D. 482, 487 n. 7 (E.D.Pa.1995)(citing *GM Trucks,* 55 F.3d at 817). These individual questions may be resolved in a separate proceeding. *Id.* It is noted that individual class members may recover significantly different amounts from the settlement fund based on various factors such as the extent of their respective injuries. However, as in *Ahearn,* the settlement agreement in this case "does not award damages to individual victims." *Ahearn,* 90 F.3d at 976. The settlement agreement merely establishes a fund from which an equitable distribution can be made to class members by a claims administrator appointed by the court. The possibility of different recovery amounts "do[es] not affect the settlement in the least." *Id.* Therefore, the fact that individual class members may recover varying amounts from the settlement fund does not defeat typicality. The court concludes that the plaintiffs have satisfied Rule 23(a)(3)'s typicality requirement.

#### 4. *Adequacy of Representation*

■ Rule 23(a)'s final prerequisite is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The question of adequacy of representation has two components. These components are designed to ensure that absentee class members' interests are fully pursued. First, "the interests of the named plaintiffs must be sufficiently aligned with those of the absentees." *Georgine,* 83 F.3d at 630. This component includes an inquiry into conflicts among various class members. *Id.* The named plaintiffs must have the ability and incentive to vigorously represent the claims of the class as well as their own. *Hassine v. Jeffes,* 846

F.2d 169, 179 (3d Cir.1988). Second, class counsel must be qualified and must advance the interests of the entire class. 83 F.3d at 630.

■ As to the first component, there are no intra-class conflicts that preclude this class from meeting the adequacy of representation requirement. The members of the class are united in seeking equitable relief under 23(b)(1)(B) and maximizing the size of the settlement fund. *See Ahearn,* 162 F.R.D. at 525. Maximization of the settlement fund also advances the interests of derivative beneficiaries such as the consortium and subrogation interests.

Decisions concerning allocation of the settlement fund will be made in separate proceedings before a claims administrator. All claimants to the settlement fund will participate in the allocation decisions. Any conceivable problems that may arise during those proceedings are not before the court at this time. Because there are no great divergent conflicts, the court declines to create subclasses at this time. The court notes that if the distribution system results in serious conflicts that cause unfair or unreasonable outcomes for certain class members, then decertification of the class is a possible consequence. Additionally, the claims of individuals implanted with orthopedic bone screws on or after January 1, 1997, are not included in the settlement class. Those individuals who have received orthopedic bone screw implants after January 1, 1997 and feel they have a claim against AcroMed, may commence appropriate actions against AcroMed. This settlement fund will not be disturbed or affected by those claims and this settlement does not bar any such claims. Therefore, as discussed above, there is no "futures" conflict in this class like the one in *Georgine. See* 83 F.3d at 630–31. The court finds that the suit is not collusive and that the representative plaintiffs do not have interests antagonistic to those of the absent class members.

As to the second component, the court finds that the plaintiffs' attorneys are qualified and highly experienced in complex tort litigation. *See Pretrial Order No. 8,* 1995 WL 273597 (E.D.Pa. Feb. 22, 1995). The plaintiffs' counsel vigorously prosecuted this action against AcroMed at all times. Additionally, the PLC has acted at arm's length from AcroMed during settlement negotiations. *See GM Trucks,* 55 F.3d at 801. Therefore, the court concludes that plaintiffs have satisfied the requirements of Rule 23(a)(4).

## D. *Limited Fund Class Actions: Rule 23(b)(1)(B)*

■ A Rule 23(b)(1)(B) class action is commonly referred to as a "limited fund" because such an action is grounded in the equitable theory that when there is only a limited fund available to satisfy the plaintiffs' claims and when individuals who sue first could deplete the fund, subsequent plaintiffs would be left without a remedy. *Advisory Committee Note,* 39 F.R.D. at 101. Under 23(b)(1)(B), a class action may be maintained where "adjudications with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests." Fed.R.Civ.P. 23(b)(1)(B). The court finds that such a situation exists in the instant case.

To satisfy Rule 23(b)(1)(B)'s requirements, the parties must present "substantive evidence" showing that AcroMed's assets would be insufficient to meet plaintiffs' claims. *See Pretrial Order No. 8; In re School Asbestos Litig.,* 789 F.2d 996, 999 (3d Cir.1986). In *Pretrial Order No. 8,* this court denied certification for a 23(b)(1)(B) class. The court rested its decision on the "somewhat vague number of actual ripe actions presently before the court." *Id.* Presently, more than two years later, events have produced numerous facts that have evolved into a clear evidentiary description of the potential claims AcroMed is facing. Currently, more than 6,200 individuals have registered with the PLC as potential AcroMed Settlement Class members. Further, at the time *Pretrial Order No. 8* was decided the court did not have the testimony and supporting facts presented by financial experts such as Dr. Rosen or Mr. Romney. This testimony has provided "substantive evidence" that

AcroMed would be unable to satisfy plaintiffs' claims in this action.

Expert testimony from the financial experts presented to the court demonstrates that AcroMed's net assets and insurance coverage are vastly insufficient to satisfy the many claims against them. Additionally, AcroMed's anticipated defense costs will alone be sufficient to consume AcroMed's asset base. After incurring those defense costs, AcroMed would have had little or no ability to pay settlements or judgments to plaintiffs in individual cases.

 Other courts have taken defense costs into consideration when making a limited fund determination. *See Ahearn,* 90 F.3d at 982; *In re Joint E. & So. Dist. Asbestos Litigation,* 982 F.2d 721 (2d Cir.1992). Caution must be exercised so as not to place this factor in a position where it does not belong, which would be to have as its principal importance the rescue of a defendant from litigation costs. Rather, the court must keep focused on its duty to test all of the factors that may point to an equitable determination to see if a limited fund exists. And whether, without a limited fund designation, AcroMed's assets and limited insurance coverage would be depleted by defense costs, or other unavoidable uses before the majority of claimants had an opportunity to advance a worthy claim to the point of a recovery. This is the essence of a limited fund classification. *See In re Agent Orange Prod. Liab. Litig.,* 100 F.R.D. 718 (E.D.N.Y.1983).

Furthermore, there is neither a challenge, nor a basis for a challenge to the notion that this settlement can not be funded from cash on hand or from the liquidation of existing assets. It will be funded from an outside infusion of $100 million of borrowed funds not otherwise available except for the terms of the settlement. In this respect, this case shares much in common with *Ahearn.* In both cases, the settlement funds are provided primarily by non-defendants who have no obligation to provide them. In this case it is important to re-emphasize that it is the settlement itself that creates the fund from otherwise unobtainable outside resources. (Tr. 4/24/97 at 244). This infusion of new money is the *sine qua non* of the settlement.

Without this infusion, the settlement cannot be accomplished and without the settlement, AcroMed will consume itself by exhausting all of its resources including its traditional borrowing potential. Because it is prudent to conclude from the unassailable history of this litigation that AcroMed can neither win nor avoid defending all of the cases presently proceeding against it, the conclusion that is equally unassailable is that the settlement is crafted around a limited fund. An unwillingness to recognize this will lead to the unacceptable result of many deserving claimants being unable to recover by settlement or judgment. This will surely follow the exhaustion of AcroMed's assets by either substantial use of resources in defense of all of the cases which course will be shortened by payments of recoveries by claimants earlier in time. This settlement shuts off AcroMed's defense cost flow and places all claimants on the same plane, at the same time, with respect to AcroMed's financial capacity to respond to all of the claims, leaving each claimants share to be determined by traditional application of equitable distribution standards. If this settlement fails, the funds that AcroMed can raise conditioned on the settlement going forward will of course not be available to class members. The loss of the settlement fund is therefore a "risk" within the meaning of Rule 23(b)(1)(B).

Based on the foregoing, the court holds that there is a convincing and substantial probability that separate actions, presently in place or otherwise, by individual class members would, as a practical matter, be dispositive of the interests of other class members and substantially impede other members from receiving payment for their injuries from AcroMed's limited asset base and insufficient insurance coverage.

**E. *Anti–Injunction Act***

 Certain class members have pending cases in state courts. Upon the court's entry of its final judgment, these class members will be enjoined from pursuing these claims further. Enjoining further litigation of settled claims by class members in other forums would not violate the Anti–Injunction Act, 28

U.S.C. § 2283 (1997) (the "Act"). The Act provides that:

> [a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

28 U.S.C. § 2283 (1997).

An injunction in this action is necessary to aid this court's jurisdiction over this action. As the Third Circuit emphasized in *In re Glenn W. Turner Enter. Litig.*:

> [f]or this exception to apply it is not enough that the requested injunction is related to that jurisdiction, but it must be necessary in aid of that jurisdiction ... Rather, federal injunctive relief is appropriate only to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case.

*In re Glenn W. Turner Enterprises Litigation*, 521 F.2d 775, 780 (3d Cir.1975) (quoting *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Eng'rs*, 398 U.S. 281, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970)). Certifying this action to proceed as a mandatory non-opt out class under Rule 23(b)(1)(B) can be properly considered necessary in aid of this court's jurisdiction. This court has continuing jurisdiction over this class action, "not only to administer the settlement fund ... but also to ensure that the Settlement Agreement as a whole is enforced according to its terms." *In re Agent Orange Prod. Liab. Litig.*, 996 F.2d 1425, 1432 (2d Cir.1993). "In a class action, the district court has a duty to class members to see that any settlement it approves is completed, and not merely to approve a promise." *Id.* (quoting *In re Corrugated Container Antitrust Litig.*, 752 F.2d 137, 141 (5th Cir.1985)). Therefore, enjoining class members from bringing claims in state courts is appropriate under this exception to the Anti–Injunction Act.

An injunction against state-court proceedings is also necessary to protect and effectuate this court's judgment certifying a class action and approving the settlement. This exception to the Act, also referred to as the relitigation exception, "was designed to permit a federal court to prevent state litigation of an issue that previously was presented to and decided by the federal court." *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 147, 108 S.Ct. 1684, 1690, 100 L.Ed.2d 127 (1988). In the circumstances presented in the case currently before this court, and if the court approves the agreement, providing that all settled claims as defined under the agreement are hereby "finally decided," the court enters a final judgment approving the settlement. Upon entry of the final judgment, the relitigation exception applies, and class members are enjoined from further pursuing settled claims in any other forum, including state courts. The presence of a final judgment avoids a violation of the Anti–Injunction Act in this situation.

### F. *Adequacy of Notice of the Settlement Agreement*

Under Federal Rule 23(e), "a class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed. R.Civ.P. 23(e). In accordance with Pretrial Order No. 724, notice of the proposed settlement agreement was published on two consecutive Fridays in *USA Today's* national edition (circulation ranging between 1.9 million and 2.4 million), once in *Parade Magazine's* national edition (81 million readers), once in *T.V. Guide's* national edition (circulation 13 million) and once in *El Nuevo Dia*, a Spanish-language newspaper of general circulation in Puerto Rico. (Tr. 4/23/97 at 14); (Ex. P–1). Additionally, "on or about January 17–20, 1997 the PLC mailed the class action notice, first-class mail, postage prepaid to 6,949 persons, including all settlement class members known to the PLC ... and all counsel of record for plaintiffs in MDL 1014." *Affidavit Of Mailing And Publication Of Class Action Notice of Settlement.* This notice was given prior to the fairness hearing to allow all interested parties an opportunity to be heard and to raise objections.

■ Under Rule 23(e), notice of a proposed settlement "must be such as is reasonably calculated to reach interested parties and apprise them of the pendency of the action." *Zimmer Paper Prod., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).[20] The court is satisfied that the notice given here fulfills the requirements of due process. The fact that registrations have been received from individual class members who reside in all fifty states, the District of Columbia, Mexico and the Czech Republic supports this finding. *PLC Updated Report to Court Concerning the Number of Non-plaintiff AcroMed Settlement Class Members per State* (Filed Oct. 16, 1997).[21]

### G. Objections

#### 1. The United States' Objections

The United States argues that federal law does not permit certification of the proposed class if the United States is included in the class definition and that the government's claims cannot be released by the settlement agreement. The government primarily bases its argument on the Medical Care Recovery Act, 42 U.S.C. § 2651 ("the Recovery Act") and the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b)(2) ("the Secondary Payer statute"). These remedies are different from typical subrogation claims.

■ For example, the Recovery Act "grants to the government a right to recover from a third-party tortfeasor the reasonable value of medical services that the government has furnished under federal programs." *Holbrook v. Andersen Corp.*, 996 F.2d 1339, 1340–41 (1st Cir.1993). The "statute gives the United States an independent right of recovery against the tortfeasor." *Id.* at 1341 (quoting *United States v. Housing Auth. of Bremerton*, 415 F.2d 239 (9th Cir.1969)); *Heusle v. National Mut. Ins. Co.*, 628 F.2d 833 (3d Cir.1980). A settlement and release does not extinguish the government's rights against a settling defendant. *Id.* The court also notes however, that the government's rights under the statute do not allow the government to collect from a settlement fund negotiated between the injured person and the settling defendant. *Id.*

The United States also argues that it cannot be compelled to assert its claims in accordance with the claims administration procedure. The United States argues that under 28 U.S.C. § 2415 a six year statute of limitations applies to the United States' claims. The government's position here is that the settling parties cannot simply agree among themselves to truncate § 2415's statute of limitations and dictate the manner in which the United States will assert its claims. The court agrees that federal law cannot be circumvented by agreement.

■ The court does not construe the term "settled claim," as defined in the settlement agreement, to extinguish any independent recovery rights the United States may have as provided for under federal law.[22]

---

**20.** The court notes that the more stringent notice standard of Rule 23(c)(2), which applies only to notice of certification in (b)(3) class actions, need not be satisfied here. *See Zimmer*, 758 F.2d at 90.

**21.** It should be noted that 2,259 of these individuals are non-plaintiffs. Presumably, these individuals registered for the class in response to the public notice disseminated through the means outlined above. The fact that these individuals did not register at the prompting of an attorney who was already representing their interests in a pending bone screw claim adds weight to the court's finding that the requirements of due process are satisfied.

**22.** This construction of the term settled claim does not conflict with case law stating that courts must approve or disapprove a proposed settlement "as a whole." *See, e.g., Evans v. Jeff D.*, 475 U.S. 717, 727, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986); *Ahearn v. Fibreboard Corp.*, 162 F.R.D. 505 (E.D.Tex.1995). The court here is not modifying the terms of the agreement as written. Under the agreement a "settled claim" refers to "assigned claims" such as "subrogation claims of workers' compensation insurers, employers, and/or health care insurers or providers." Under § 2651 or § 1395y(b)(2), unlike traditional subrogation remedies, these federal statutes provide the government with direct and independent relief from a tortfeasor. *See, e.g., United States v. Theriaque*, 674 F.Supp. 395 (D.Mass.1987) (government is more than mere subrogee). Therefore, these statutorily sanctioned direct claims are unaffected by the agreement.

Moreover, the court cannot do so. The court does not have the power to impair the federal government's ability to enforce federal law. Therefore, as the court construes the agreement, the United States' rights under applicable federal law are not impacted or limited by this settlement.

### 2. *Rule 23(b)(1)(B) Non–Opt Out Classes and Due Process*

■ Certain class members object to the settlement on the grounds that certification of a mandatory class under Rule 23(b)(1)(B) violates due process. *See, e.g., Post Hr'g Brief of the Brown Objectors.*[23] The objecting class members primarily rely on *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), for the proposition that they should have the right to opt out of the class. The court disagrees with the objecting class members' interpretation of the *Shutts* decision.

■ The court finds the Fifth Circuit's decision in *Ahearn* instructive. The *Ahearn* majority focused on the equitable nature of 23(b)(1)(B) class certification and held that certification of a mandatory class under Rule 23(b)(1)(B) does not violate due process. *Ahearn,* 90 F.3d at 986–87. This court agrees. A Rule 23(b)(1)(B) "limited fund class action is an equitable and unitary disposition of a fund too small to satisfy all claims." *Id.* at 986. Limited fund class actions "sound in equity even though the relief they provide necessarily affects the amount of money damages that claimants can ultimately receive." *Id.* The court understands the Supreme Court's decision in *Shutts* to be limited to "claims wholly or predominately for money judgments." Therefore, *Shutts* does not prohibit mandatory class certification under Rule 23(b)(1)(B) which is purely equitable in nature. *See Shutts,* 472 U.S. at 811–12 n. 3, 105 S.Ct. at 2974 n. 3; *see also* Newberg & Conte, 1 *Newberg on Class Actions* § 1.14–.20.

■ Additionally, the court also agrees with the *Ahearn* court's holding that "minimum contacts or consent to jurisdiction are not necessary in equitable [limited fund]

class actions." 90 F.3d at 987. Limited fund class actions certified under Rule 23(b)(1)(B) "closely resemble actions for interpleader, or for the accounting of a trustee." *Id.* "The court can appropriately adjudicate all claims against the fund because of its jurisdiction over the fund and the fact that all potential claimants are adequately represented before it." *Id.; see also* Newberg and Conte, 1 *Newberg on Class Actions,* § 1.20–21. This court has already found that 23(a)(4)'s adequacy of representation requirement is met in this case. The finding of adequate representation is based on the court's belief that absent class members received the due process protections traditionally required in mandatory class actions. Additionally, this transferee court has jurisdiction over this multi-district litigation for all pretrial purposes, including settlement, and therefore has jurisdiction over the fund. *See* 28 U.S.C. § 1407. Therefore, the court rejects the objecting class members' contention that a mandatory 23(1)(b)(B) class action may not be certified if it binds class members who may not have the minimum contacts necessary for personal jurisdiction.

This finding is not in conflict with the Third Circuit's decision in *In re Real Estate Title & Settlement Serv. Antitrust Litig.,* 869 F.2d 760 (3d Cir.1989). In that case, the court held that an absent class member in a 23(b)(2) hybrid (damage and injunctive) class action must have minimum contacts with the forum or consent to jurisdiction in order to be bound by the class action judgment and enjoined from relitigation. *Id.* at 769. The class seeking certification before this court is in a different posture than the class in *In re Real Estate.* This case is not a hybrid class action. This is a 23(b)(1)(B) limited fund case that is entirely equitable in nature. The Third Circuit, in *In re Real Estate,* did not reach "the issue of what procedural protections are required before a court can enjoin a suit by a party who was part of a class action for *purely equitable* relief." *Id.* at 768 (emphasis added). Further, the Third Circuit noted, "[n]either do we address the due process requirements in a class action certified under Rule 23(b)(1) in which there is only a

---

**23.** The "Brown Objectors" consist of two class members.

limited common fund from which the plaintiffs can obtain relief." *Id.* at 768 n. 8. Therefore, the court holds that certifying a mandatory, non-opt out class under Rule 23(b)(1)(B) does not violate due process and comports with the Supreme Court's decision in *Shutts* and the Third Circuit's decision in *In re Real Estate.*

### 3. Releasing Claims Against Unnamed Parties

 The settlement agreement provides for the dismissal of certain claims against various "Released Parties,"[24] including health care providers. Certain objectors contend that the court cannot release these claims. The court disagrees. A federal court may approve a settlement that releases claims "based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action." *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287 (9th Cir.1992) (quoting *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2d Cir.1982)). *See also, Grimes v. Vitalink Communications Corp.,* 17 F.3d 1553, 1563 (3d Cir.1994); *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 221 (5th Cir.1981). The released claims against the health care providers are those based in whole or in part on any products liability-related theory of recovery. These products liability-related claims have the same underlying factual predicate as the products liability claims of the settlement class. Therefore, the court finds that the release of these claims against these parties does not render the settlement unfair.

### 4. Contribution and Indemnity of Non-Settling Defendants [25]

 The settlement agreement contains a release and dismissal of contribution and indemnity claims by non-settling defendants. In their joint motion the PLC and AcroMed

assert that without an order barring non-settling defendants' contribution claims, it would be nearly impossible for one defendant in a multi-defendant mass tort litigation to settle. In that light, bar orders play an important role in facilitating settlement and many class action settlements include bar orders. *In re Silicone Gel Breast Implant Prods. Liab. Litig.,* 1994 WL 578353, *18–19 (N.D.Ala. Sept. 1, 1994); *In re U.S. Oil and Gas Litig.,* 967 F.2d 489, 494 (11th Cir.1992). In addition to the bar order, the agreement also contains a provision whereby the Settlement Class members agree to set-off and judgment reductions in subsequent actions against non-settling defendants. The parties explain the effect of this provision as follows:

> Non-settling defendants have, at a minimum, the set-off and judgment reduction rights to which they are entitled by operation of applicable state law. The Settlement agreement does not adversely affect any state-law set-off and judgment reduction rights. The Agreement now expressly incorporates what is known in Pennsylvania as a *"Griffin* release," under which the plaintiffs agree that non-settling defendants have set-off and judgment reduction rights regardless of the lack of a judicial determination that the settling defendant is a joint tortfeasor. *See Griffin v. United States,* 500 F.2d 1059 (3d Cir.1974); *see also Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963).

> To further protect non-settling defendants' rights of contribution and indemnity, class members have agreed that, in situations in which AcroMed or the Released Parties would have been liable on a claim for contribution or indemnity but for the bar order, class members will reduce any judgments against non-settling defendants by the amount required under applicable law to extinguish the liability of AcroMed and the Released Parties.

*Settling Parties Proposed Findings of Fact* ¶ 261. The court finds that this provision

---

24. The specific definition of these terms is set forth in Section I of the settlement agreement.

25. The Sofamor/Danek defendants were granted standing to intervene in the Class Action pursuant to Federal Rule of Civil Procedure 24(a)(2)

for the *limited purpose* of protecting their contribution claims against AcroMed. *See Pretrial Order No. 837,* 1997 WL 164237, at *4 (E.D.Pa. Mar. 26, 1997).

substantially protects non-settling defendants' interests. Further, this provision is consistent with the third Circuit's "policy of encouraging settlement of complex litigation that otherwise could linger for years." *In re School Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir.1990). Therefore, the court approves this provision as being fair, adequate and reasonable.

Many states have settlement bar statutes allowing a bar to contribution rights. As part of their presentation at the fairness hearing, AcroMed and the PLC supplied the court with a detailed fifty-state analysis on this issue. *See* Ex. P–20a, 20b and 20c. When considered together, and read in light of applicable state law, the bar order and the set-off and reduction provisions protect the interests of the non-settling defendants. The set-off and reduction provisions assure that the non-settling defendants will pay no more than they would have paid had they been able to seek contribution or indemnity. Further, given the court's finding that, in light of the expected level of defense costs, continued litigation would leave AcroMed with little, if any, cash to compensate plaintiffs, there would also be little, if any, resources available to satisfy judgments for contribution or indemnity. Therefore, the set-off and reduction provisions put non-settling defendants in a more favorable position than they would have been if a settlement was not reached.

AcroMed and the PLC have also agreed that the bar order shall incorporate the following provision:

a. If, despite the provisions of Section XI.B.1, (I) applicable law precludes a Non–Settling Defendant from obtaining a set-off or judgment reduction to which a Non–Settling Defendant would otherwise be entitled under applicable law in an individual case brought by a Settlement Class Member without naming AcroMed or a Released Party as a party, in the lawsuit and (ii) the Non–Settling Defendant and the Settlement Class Member cannot reach agreement on this issue sufficient to eliminate the Non–Settling Defendant's alleged need to name AcroMed or a Released Party in the lawsuit, the Non–Settling Defendant may apply to the Court for relief from the bar order.

*See* (Tr. 7/8/97 at 40–43). This provision provides a procedure under which non-settling defendants will be able to fully protect their set-off and judgment rights should any state-law preclude their ability to do so. The court finds that this provision further protects non-settling defendants' interests and demonstrates a fair and reasonable accommodation toward all affected parties.

State statutes and court decisions differ as to what form the judgment credits should take. Certain states require a proportionate share reduction, others apply a *pro tanto* judgment credit and some states give a *pro rata* credit. *See* Ex. P–20a, 20b and 20c. Regardless of the applicable jurisdiction, under this agreement, non-settling defendants will receive, at a minimum, a set-off or judgment reduction consistent with state law. Allowing non-settling defendants the benefit of whatever judgment reduction that is required under state law is fair and reasonable. The court concludes that the bar order is essential to the settlement and is within the court's powers to approve it, and because all parties are adequately protected by its application, the order will be approved.

The court notes that despite its findings, the settlement can not bar the application of a state law that may allow a contribution claim to go forward. The parties cannot successfully agree to circumvent the law, nor can the court sanction circumvention. Therefore, AcroMed, not the settling class or the settlement fund, will be responsible for resolving contribution claims that may arise in states whose law allows them to go forward despite the agreement. Additionally, this court will retain jurisdiction over the parties to the settlement agreement as a court of equity and will retain the power to ensure that the primary purpose and intent of the agreement is carried out. It will be the court's duty to ensure, within the reach of its powers, that any class members, AcroMed and any non-settling defendants are not improperly deprived of benefits that they reasonably expect to receive in exchange for the bar order or any other provi-

sion to which they are subject under the agreement.

### 5. *Subrogation Objections*

■ Under the settlement agreement, class members asserting subrogation rights were required to assert those rights by May 1, 1997. Certain objectors argue that this deadline is unreasonable. The court disagrees. Subrogation parties have had notice of their claims for a significant amount of time. Most are fully documented and tracked. The court notes that diligent subrogation claimants were able to comply with the deadline established in the settlement agreement. However, those subrogation claimants who did not meet that deadline are not completely without recourse. Issues relating to the timeliness of subrogation claims and to the validity of those claims will be resolved in the first instance by a court appointed claims administrator, with subsequent review by this court. The PLC, and the claims administrator when one is appointed, must accept and save all subrogation claims submitted by all carriers until this issue is resolved.

■ Certain objectors also challenge the provision of the settlement agreement that provides that subrogation claims will not be honored unless the person on whose behalf health benefits were paid registers to participate in the settlement fund. *Settlement Agreement Section X.E.2.* It is important to realize the equitable effect that a limited fund designation will have on AcroMed and the parties making claims against AcroMed. Under the application of Rule 23(b)(1)(B), AcroMed will be stepping away from the litigation and be replaced by the settlement fund. The parties then must make their claims against the settlement fund. Registration in the class is the proper method to make such claims. If a party does not properly register to share in the equitable allocation of the fund, then that party does not share in the fund. The court notes that a subrogee's rights can rise no higher than that of its subrogor. Certain of those subrogation claims may not be paid under the terms of the settlement: agreement because the bone screw recipient to whom benefits

were paid did not register. However, the court notes that nothing in the settlement agreement prevents or interferes with the health benefit providers' ability to protect such rights as they have by asserting claims under the terms of the agreement with respect to their insureds. Also, if the bone screw recipient, in his or her relationship with the subrogee owes some duty to the subrogee, to cooperate or provide information for example, the settlement does not extinguish whatever remedy the subrogee may have in that regard. In terms of the settlement's overall fairness and the size of the settlement fund, the interests of subrogation claimants are aligned with the interests of plaintiffs who have received bone screw implants. All share a common interest in maximizing the size of the settlement fund from which their claims can be satisfied under equitable allocation procedures. The court finds that the treatment of subrogation claimants under the settlement, in this limited fund context, is fair, adequate and reasonable.

### 6. *Prohibiting Contingency Fees After December 5, 1996*

The settlement agreement provides that counsel retained on or after December 5, 1996, the date on which the settlement was announced, are not entitled to contingency fees. These attorneys are to be compensated on an hourly basis only. Certain objectors have opposed this provision.

■ The court has broad equitable powers to monitor contingency fee agreements. *Green v. Nevers,* 111 F.3d 1295 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997); *Dunn v. H.K. Porter Co.,* 602 F.2d 1105 (3d Cir.1979). "For a contingent fee to be appropriate, there must be a realistic risk of nonrecovery." *In re Combustion, Inc.,* 968 F.Supp. 1116 (W.D.La.1997)(citing *In re Quantum Health Resources, Inc.,* 962 F.Supp. 1254, 1256 (C.D.Cal.1997)). Further, courts are not necessarily bound by a contingent fee agreement executed between a plaintiff and counsel. *Jenkins v. McCoy,* 882 F.Supp. 549 (S.D.W.Va.1995).

In this case several plaintiffs signed contingency fee agreements with counsel after the settlement agreement was announced. The announcement of a settlement plainly removes the contingency in those cases settled under the agreement. Once a settlement is reached and approved there is no longer a risk of nonrecovery. Therefore, the provision prohibiting a contingency fee, and requiring compensation on an hourly basis for counsel retained on or after December 5, 1996 is reasonable.

## H. *Fairness of the Proposed Settlement*

Prior to granting a motion for final approval of the settlement, the court must find it to be "fair, adequate, and reasonable." *Pozzi v. Smith*, 952 F.Supp. 218 (E.D.Pa.1997); *Walsh v. Great Atlantic & Pacific Tea Co.*, 726 F.2d 956, 965 (3d Cir. 1983). The Third Circuit has adopted a nine-factor guide to help district courts structure their final decisions to approve settlements as fair, reasonable and adequate as required by Rule 23(e). Those factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *Pozzi*, 952 F.Supp. 218 (E.D.Pa. 1997); *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975). These factors are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under *Girsh*. *Pozzi*, 952 F.Supp. at 224.

Significant weight should be attributed "to the belief of experienced counsel that settlement is in the best interest of the class." *Austin v. Pennsylvania Dep't. Of Corrections*, 876 F.Supp. 1437, 1472 (E.D.Pa.

1995). However, due to the risk that a collusive settlement agreement may be reached that fails to satisfy the class members' best interests, the court must conclude that the settlement was the product of "good faith, arms length negotiations" before granting its approval. *Pozzi*, 952 F.Supp. at 222; *see also Lake v. First Nationwide Bank*, 900 F.Supp. 726, 731 (E.D.Pa.1995). The court finds that good faith, arms' length negotiations took place and that this settlement is not collusive in any respect.

The first *Girsh* factor looks to the complexity, expense and likely duration of the litigation. The court has already determined that further litigation would be exorbitantly expensive to the parties. As noted above there are over 3,000 pending claims against AcroMed. Each claim could result in protracted and costly proceedings. However, litigation costs are not the only consideration. The complexities of mass tort litigation places significant strains on court dockets. Prior to this case being transferred to this court for pretrial purposes, claims were filed in eighty-five federal districts in forty-six states. This figure, of course, does not account for the large number of claims filed in state courts. Therefore, it is clear that further litigation of these claims would also result in a great expenditure of judicial resources. As the Third Circuit stated in *GM Trucks*, "the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." 55 F.3d at 784. Therefore, given the expenditure of both time and money that will be avoided by both the parties and the judicial system, this factor weighs heavily in favor of approval of the proposed class settlement.

The second *Girsh* factor considers the reaction of the class to the settlement. The reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. *Sala v. National R.R. Passenger Corp.*, 721 F.Supp. 80 (E.D.Pa.1989); *see also Austin*, 876 F.Supp. at 1458. Class members have reacted favorably to the proposed settlement. The majority of claimants are represented by

counsel who monitored the PLC's settlement negotiations with AcroMed. Even with the scrutiny of counsel, only 52 plaintiffs who had been implanted with AcroMed devices objected to the settlement. (Tr. 4/23/97 at 54). The court notes that the fact that there is opposition does not alone dictate rejection of the settlement. *Austin*, 876 F.Supp. at 1458; *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803 (3d Cir.1974). It would certainly be preferable if there were no objections but that would be contrary to a mature and realistic expectation in a settlement such as this one. What is meaningful in this regard is that the relatively low objection rate "militates strongly in favor of approval of the settlement." *Sala*, 721 F.Supp. at 83.

The third *Girsh* factor assesses the stage of the proceedings and the amount of discovery completed. This litigation has been before the court for pretrial purposes for over two and one half years prior to the parties reaching the settlement agreement and has reached a mature stage. Approximately ninety percent of class wide fact and expert discovery now has been completed. Approximately 300 civil actions, including over 500 plaintiffs, many with "omni" claims, will be suggested to the Multidistrict Litigation Panel for remand within thirty days of the entry of this memorandum and order. Following remand it is likely that no more than thirty to sixty days of discovery will be needed to update some evidentiary items and complete some expert disclosures that were specially reserved for administration by the transferor court. *See Pretrial Order No. 764*, 1997 WL 303239 (E.D.Pa. Feb. 3, 1997). The cases can then be tried. The parties have assembled thousands of significant documents, depositions and other items of evidence to offer in support of and in defense of the claims alleged in this litigation. The court finds that counsel on both sides possessed an "adequate appreciation of the merits" prior to beginning the negotiation process. *GM Trucks*, 55 F.3d at 813–14. Therefore, an assessment of this factor also weighs in favor of approving the settlement.

The fourth *Girsh* factor focuses on the risks of establishing liability. The plaintiffs in this case do face the risk of being unable to establish liability at trial if the settlement is not approved. While this court is not ruling on the merits of any particular case, the court notes that proving the causation element of their claims would likely present problems for many claimants. Products liability actions can be quite complicated and the issues of actual and proximate cause elevate the complexity. Many class members approached the prospect of surgery because of prior back and spine injuries that caused the individual treating physicians to implant the orthopedic bone screws as part of their treatment. It will be difficult for many plaintiffs to show the extent or even the existence of additional or aggravating injury caused by the alleged defectiveness of the orthopedic bone screws. In many cases, questions of causation would likely be close calls for the court or the trier of fact. The complexity of causation presents a risk to the claimants in their ability to establish liability. The risk of establishing liability plainly favors settlement for this class.

The fifth *Girsh* factor examines the risks of establishing damages. This factor follows the assessment of the plaintiffs' ability to establish liability discussed in the fourth *Girsh* factor above. Again, the court is neither expected, nor able to decide the merits of these individual claims. However, the court weighs as best it can the facts and contentions before it. Doing so, it notes that the previous injuries and disabilities which existed before many claimants received bone screw implants during spinal fusion surgery will make the damage allocation determination difficult for the trier of fact or in some instances, the court. The risk of establishing damages also favors settlement for this class, although not as heavily as other factors.

The sixth *Girsh* factor looks at the risks of maintaining the class action through trial. This class could not be maintained for trial. The court denied class action certification under Rule 23(b)(1)(B), (b)(2) and (b)(3) in *Pretrial Order No. 8*. The class currently before the court is seeking certification for settlement purposes only, not for litigation. If the settlement is not approved, there would not be a class and individual adjudications would be necessary. The court has

found that the circumstances of AcroMed's present and potential financial condition with respect to pending claims and defense costs create a limited fund status for the settlement. Because a class would not be certified absent the settlement and individual actions would likely deplete AcroMed's asset base before many claimants ever got into court to present evidence on their claims, this factor also bears heavily in favor of settlement.

The seventh *Girsh* factor calls for an evaluation of AcroMed's ability to withstand a greater judgment. The court has explained that, given AcroMed's small asset base and minimal insurance coverage, a limited fund designation is warranted. It is inherent in this finding that the court also finds that AcroMed would not be able to withstand a greater aggregation of judgments than the proposed settlement amount of $100 million. The court concludes that this factor also weighs heavily in favor of approving the settlement.

The eighth *Girsh* factor is "whether [the fund] falls within a range of reasonableness and not simply whether it is the most favorable response possible." *In re General Motors Corp. Pickup Truck Fuel Tank Products Liability Litigation,* ( *GM Trucks* ), 846 F.Supp. 330, 337 (E.D.Pa.1993). The court recognizes that "settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *GM Trucks,* 55 F.3d at 806. When weighing this factor, the court cannot ignore its finding that a limited fund exists. The limited fund status overlaps with the ninth *Girsh* factor and the court will discuss them together. The ninth *Girsh* factor requires the court to determine if the settlement falls within the range of reasonableness in light of all the attendant risks of litigation. The defense costs that AcroMed is faced with if this litigation were to go forward would consume its assets within two to three years. The creation of the $100 million settlement fund from outside sources in the market place makes available, within one year, almost the entire value of the company. (Ex. P–6 at 9). Given AcroMed's limited asset base and minimal Insurance coverage, the $100 million settlement, in this court's opinion, is safely within the range of reasonableness. Further, the certainty of the settlement eliminates any risks associated with going forward with this litigation. These risks not only include the financial risks of AcroMed's assets dissipating, but also include the risks of the class members' ability to establish liability and damages. It is easy to see that, both the eighth and ninth *Girsh* factors weigh in favor of approving the settlement.

The *Girsh* factors, taken as a whole, plainly support approval of the proposed settlement. Settlement is particularly favorable in the 23(b)(1)(B) limited fund context "where litigation would consume the available resources." 55 F.3d at 784. If 23(b)(1)(B) means what it says, it must apply to this settlement.

The court finds that the proposed settlement is fair, adequate and reasonable to all class members, including subrogation claimants and other derivative claimants as well as parties outside of the class, but affected by it.

The settlement agreement, as construed by the court herein, is approved in accordance with Federal Rule of Civil Procedure 23(e). An appropriate Order follows.

### *FINAL ORDER AND JUDGMENT*

AND NOW, TO WIT, this 17th day of October, 1997, upon consideration of the Joint Motion of the Plaintiffs' Legal Committee ("PLC") and AcroMed Corporation ("AcroMed") for Approval of the Proposed Settlement Agreement and for Certification of a Settlement Class under Rule 23(b)(1)(B) IT IS ORDERED that:

1. The capitalized terms used in this Final Order and Judgment shall have the same meaning as those in the Agreement, as amended except for the following clarifications that have been agreed to by AcroMed and the PLC:

 a. The Agreement includes AcroMed's insurers within the definition of "AcroMed." No insurer will be released until the efforts of AcroMed and the PLC to obtain that insurer's contributions to the AcroMed Settlement Fund are completed to the satisfaction of AcroMed, the PLC, and the court.

## A. *The Settlement Class*

1. The Settlement Class IS CERTIFIED, FOR SETTLEMENT PURPOSES ONLY, under Fed.R.Civ.P. 23(a), 23(b)(1), and 23(e) in *Fanning, et al. v. AcroMed Corporation* (the "Action") and is defined as follows:

All persons and entities wherever located, who have or may in the future have any claim (whether filed or unfiled, existing or contingent, and specifically including claims for alleged injuries and damages not yet known or manifest), including assigned claims (*e.g.* subrogation claims by workers' compensation insurers, employers, and/or health care insurers or providers), in any state or federal courts of the United States or the courts of its territories or possessions, against any or all of AcroMed and the Released Parties arising out of, based upon, related to, or involving Orthopedic Bone Screws that were implanted in the United States or its territories or possessions in an operation that occurred on or before December 31, 1996, including all persons who have been implanted with one or more Orthopedic Bone Screws on or before December 31, 1996 (whether or not any such Orthopedic Bone Screw has been or may be removed) and all persons, including spouses, parents, children, relatives, "significant others" where warranted by law, representatives, and estates, that, because of a personal relationship with any Orthopedic Bone Screw Recipient in whom an Orthopedic Bone Screw was implanted on or before December 31, 1996, have or may have Orthopedic Bone Screw Related claims.

The Settlement Class does not include (a) AcroMed, the Released Parties, the Professional Societies, or any person claiming by or through such persons and entities or (b) any Non–Settling Defendant, including without limitation, all device manufacturers or health care providers named as defendants in MDL Docket No. 1014, or any person claiming by or through such persons or entities, except to the extent that the Non–Settling Defendant is an insurance carrier that, in some other capacity, may assert assigned claims or subrogation rights, in which case the insurance company is a settlement class member only for purposes of asserting assigned claims or subrogation rights.

2. The court's findings are without prejudice to AcroMed's rights under Fed.R.Civ.P. 23 and the Agreement if the Settlement is not finally approved at the expiration of all appeal periods.

## B. *The Fairness of the Settlement*

1. The Agreement and the amendments to the Agreement have been entered into in good faith following arms-length negotiations and are non-collusive. The proposed Settlement of the Action on the terms and conditions set forth in the Agreement, as amended, is fair, reasonable, adequate, and in the best interest of the Settlement Class. The Settlement is also fair, reasonable, and adequate from the perspective of Non–Settling Defendants and other affected parties.

2. The Notice provided for and given to the Settlement Class constitutes the best notice practicable under the circumstances and fully complies with the notice requirements of due process and Fed.R.Civ.P. 23.

## C. *The Settlement Terms*

1. The Agreement, as amended, and the proposed Settlement are hereby APPROVED and shall be consummated in accordance with the terms and provisions of the Agreement, as amended.

2. The Action is DISMISSED WITH PREJUDICE and without costs to any party, in accordance with Fed.R.Civ.P. 23. AcroMed and the Released Parties are hereby released and discharged, as to each and every Settlement Class Member, from any and all claims, actions, causes of action, rights, and liabilities whatsoever, known or unknown, in any capacity in any court or tribunal, for any relief, alleged or asserted or that could have been alleged or asserted in the Action, or based upon, relating to, or connected in any way to, or arising out of any of the acts, failures to act, representations, omissions, matters, actions, transactions, agreements, situations, courses of conduct,

facts, or circumstances alleged or referred to in the Action.

3. All actions pending in MDL Docket No. 1014 involving AcroMed Orthopedic Bone Screws and/or AcroMed Orthopedic Bone Screw Recipients are STAYED until further Order of the court as to all persons other than AcroMed, the Released Parties, and the Professional Societies. All actions are DISMISSED WITH PREJUDICE as to AcroMed, the Released Parties, and the Professional Societies, on the merits and without costs to any party. All actions pending in MDL Docket No. 1014 involving Non–AcroMed Orthopedic Bone Screws and/or Non–AcroMed Orthopedic Bone Screw Recipients are DISMISSED WITH PREJUDICE as to AcroMed and the Released Parties on the merits and without costs to any party. The stay of actions involving AcroMed Orthopedic Bone Screws and/or AcroMed Orthopedic Bone Screw Recipients as to medical device manufacturers other than AcroMed named as defendants in those cases shall be lifted only (a) as to a particular person in connection with a settlement in MDL Docket No. 1014 between the PLC and that person in which the PLC complies with the terms of the Agreement or (b) under terms and conditions (including but not limited to appropriate funding of the AcroMed Settlement Contingency Fund), proposed by the PLC and/or AcroMed, accepted by AcroMed (which acceptance shall not be unreasonably withheld), and approved by the Court, sufficient to protect AcroMed's interest in the finality of the Settlement and this Order and AcroMed's rights under the Agreement.

4. All Settlement Class Members are permanently BARRED and ENJOINED from initiating, asserting, or prosecuting any Orthopedic Bone Screw related actions against AcroMed or the Released Parties.

5. All Settlement Class Members who are AcroMed Orthopedic Bone Screw Recipients (or whose claims rest on the implantation of AcroMed Orthopedic Bone Screws) are ENJOINED, until further Order of the Court, from initiating, asserting, or prosecuting any actions presenting claims in the nature of conspiracy or concert of action against any person other than AcroMed, the Released Parties, and the Professional Societies. This injunction shall be lifted only (a) as to a particular person in connection with a settlement in MDL Docket No. 1014 between the PLC and that person in which the PLC complies with the terms of the Agreement or (b) under terms and conditions (including but not limited to appropriate funding of the AcroMed Settlement Contingency Fund), proposed by the PLC and/or AcroMed, accepted by AcroMed (which acceptance shall not be unreasonably withheld), and approved by the Court, sufficient to protect AcroMed's interest in the finality of the Settlement and this Order and AcroMed's rights under the Agreement.

6. All Settlement Class Members who are AcroMed Orthopedic Bone Screw Recipients (or whose claims rest on the implantation of AcroMed Orthopedic Bone Screws) are permanently BARRED and ENJOINED from initiating, asserting, or prosecuting any actions presenting Settled Claims against any party. Settlement Class Members who are AcroMed Orthopedic Bone Screw Recipients (or whose claims rest on the implantation of AcroMed Orthopedic Bone Screws) may not initiate, assert, or prosecute Orthopedic Bone Screw related claims, unless: (a) the claim is in the nature of a claim for alleged independent medical malpractice against any physician who treated the Settlement Class Member or any institution at which the Settlement Class Member was treated based upon medical care rendered to the Settlement Class Member; and (b) the claim does not (I) rest in whole or in part on any product liability-related theory of recovery, including without limitation design or manufacturing defect, the regulatory status of any AcroMed Orthopedic Bone Screw, or alleged failure to warn, nondisclosure, or inaccurate or incomplete disclosure, of the regulatory status of any AcroMed Orthopedic Bone Screw or (ii) have as an element of the claim financial relationships with AcroMed and/or an alleged conflict of interest based upon any such financial relationship (impeachment shall not be considered an element of a claim).

7. AcroMed and the Released Parties are RELEASED and DISCHARGED from all Settled Claims of all Settlement Class Members. The Professional Societies are RELEASED and DISCHARGED from all Settled Claims of all Settlement Class Members who are AcroMed Orthopedic Bone Screw Recipients (or whose claims rest on the implantation of AcroMed Orthopedic Bone Screws).

8. Each Settlement Class Member shall be deemed to have relinquished, to the fullest extent permitted by law, the provision, rights, and benefits of any state or federal law, rule, or regulation that purports to restrict the scope of a general release to claims which the party knows or suspects to exist in his favor, whether or not knowledge of such a claim would have materially affected his settlement with the other party.

9. Non–Settling Defendants and other third parties are permanently BARRED and ENJOINED from initiating, asserting, or prosecuting any claim or action, including Claims for Contribution, Indemnity, and/or Subrogation, against AcroMed and the Released Parties for reimbursement of payments made to or on behalf of any Settlement Classy Member for Orthopedic Bone Screw related claims or injuries, subject only to the following exception:

a. If, despite the provisions of Section XI.B.1 of the Agreement, (I) applicable law precludes a Non–Settling Defendant from obtaining a set-off or judgment reduction to which a Non–Settling Defendant would otherwise be entitled under applicable law in an individual case brought by a Settlement Class Member without naming AcroMed or a Released Party as a party in the lawsuit and (ii) the Non–Settling Defendant and the Settlement Class Member cannot reach agreement on this issue sufficient to eliminate the Non–Settling Defendant's alleged need to name AcroMed or a Released Party in the lawsuit, the Non–Settling Defendant may apply to the Court for relief from this bar order.

b. The Non–Settling Defendant's application to the Court shall set forth with specificity (I) the facts and law that would give rise to a claim for contribution or indemnity but for the provisions of this Agreement; (ii) the efforts that the Non–Settling Defendant has made to reach an accommodation with the Settlement Class Member with respect to the need to name AcroMed or a Released Party as a defendant in the case; and (iii) the factual and legal bases for the Non–Settling Defendant's claim that, under the particular facts of the case and the particular provisions of applicable law, the Non–Settling Defendant must be permitted to name AcroMed or a Released Party in the case despite the bar order.

c. A copy of the Non–Settling Defendant's application to the Court shall be served on the PLC and counsel for AcroMed.

d. The Court shall modify the bar order to permit a Non–Settling Defendant to name AcroMed or a Released Party in a particular case brought against the Non–Settling Defendant by a Settlement Class Member only where doing so is essential to protect set-off or judgment reduction rights to which the Non–Settling Defendant would be entitled under applicable law but for the provisions of this Agreement. Any order modifying the bar order will contain provisions that protect the interests of AcroMed and the Released Parties under this Agreement, including, among other things, provisions affirming that the Settlement Class Member has agreed (I) to forego any direct or indirect recovery from AcroMed or the Released Parties of sums over and above those received under this Agreement and (ii) to give up any portion of any judgment obtained against a Non–Settling Defendant that is attributed to AcroMed or any Released Party.

e. Applications made by Non–Settling Defendants for modification of the bar order will be subject to the provisions of Fed.R.Civ.P. 11.

10. Decisions regarding the timeliness and validity of claims by which persons claiming subrogation rights seek to recover from the AcroMed Settlement Fund are reserved for initial consideration by the Claims

Administrator, subject to later review by this Court.

11. The Agreement, this Final Order and Judgment, and all papers related to the Settlement are not, and shall not in any event be, an admission by AcroMed, the Released Parties, or any other person of any liability or wrongdoing whatsoever, and shall not be offered as evidence of any claimed liability or wrongdoing whatsoever in this or any future proceeding.

12. The Court approves the termination provisions of Section VII of the Agreement so that, if the Agreement is terminated, all monies paid by AcroMed, plus all interest actually earned or accrued, less any Notice Expenses and Administrator Expenses, shall be returned to AcroMed.

13. The Parties are directed to carry out their obligations under the Agreement forthwith.

14. This Court reserves continuing and exclusive jurisdiction over the Parties to the Agreement, including AcroMed and the Released Parties, and all Settlement Class Members, to administer, supervise, construe, and enforce the Agreement and this Final Order and Judgment in accordance with their terms for the mutual benefit of the Parties and the Settlement Class. The Court retains continuing and exclusive jurisdiction for purposes of, among other things, approval of the Condition Definitions and Compensation Schedule, supervision and administration of the Compensation Program, the payment of attorneys' fees and expenses and awards to Settlement Class Members, and matters concerning claims administration and the distribution of settlement funds and payment of related fees and expenses until the effectuation of the Settlement in accordance with the Agreement has been accomplished.

15. This Order is binding on ALL Settlement Class Members.

16. The Clerk of Court is directed to enter this Final Order and Judgment as a final judgment under Fed.R.Civ.P. 54(b).